# Illinois Official Reports

## Supreme Court

---

### *People v. Logan*, 2024 IL 129054

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JESSICA A. LOGAN, Appellant. |
| Docket No. | 129054 |
| Filed | March 21, 2024 |
| Modified upon denial of rehearing | May 28, 2024 |
| Decision Under Review | Appeal from the Appellate Court for the Fourth District; heard in that court on appeal from the Circuit Court of Macon County, the Hon. Thomas E. Griffith, Judge, presiding. |
| Judgment | Judgments affirmed. |
| Counsel on Appeal | James E. Chadd, State Appellate Defender, Douglas R. Hoff, Deputy Defender, and Gilbert C. Lenz, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant. |
| | Kwame Raoul, Attorney General, of Springfield (Jane Elinor Notz, Solicitor General, and Katherine M. Doersch and Joshua M. Schneider, Assistant Attorneys General, of Chicago, of counsel), for the People. |

Justices  JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Overstreet, Rochford, and O'Brien concurred in the judgment and opinion.

Justice Holder White took no part in the decision.

## OPINION

¶ 1    Following a jury trial in the circuit court of Macon County, the defendant, Jessica Logan, was convicted of the first degree murder of her 19-month-old son, J.C., and sentenced to 33 years in prison. Prior to trial, Logan filed a motion to suppress a video of a reenactment of J.C.'s death on the ground that the police should have admonished her under *Miranda v. Arizona*, 384 U.S. 436 (1966). The trial court denied the motion to suppress, and the video was admitted into evidence and published to the jury during the State's case-in-chief. The appellate court affirmed the trial court's judgment, holding that the reenactment was not custodial. 2022 IL App (4th) 210492, ¶ 83. For the reasons that follow, we affirm the judgment of the appellate court, but for a different reason than that upon which the appellate court relied.

¶ 2                                    BACKGROUND

¶ 3    On November 25, 2019, the State charged Logan by information with three counts of first degree murder. The information alleged that on or between October 6 and 7, 2019, Logan knowingly asphyxiated J.C., thereby causing his death. See 720 ILCS 5/9-1(a)(1), (2) (West 2018).

¶ 4    Prior to trial, Logan filed a motion to suppress an October 17, 2019, video recording of her reenactment of her discovery of J.C.'s body. In the motion, Logan alleged that, following J.C.'s death and prior to her arrest on October 23, 2019, both the Department of Children and Family Services (DCFS) and detectives from the Decatur Police Department told her "that she would need to perform a reenactment of the events that transpired the night of J.C.'s death." She alleged that, "[o]n numerous occasions, she was told by DCFS investigator, Leandra Tate, that she would be required to participate in said reenactment." On the date of the reenactment, Logan arrived at her home with Hope Taylor (J.C.'s biological grandmother) and Logan's four-year-old son. Upon their arrival, they were met by two DCFS investigators and three Decatur police officers. Logan alleged that all three police officers "were wearing vests indicating that they were police officers, they all wore badges around their necks indicating that they were police officers and they all had firearms that were in plain view."

¶ 5    Logan alleged that Taylor and Logan's four-year-old son "were told that they would not be allowed to enter the home with [Logan] while the reenactment occurred and that they would need to remain outside." She alleged that no one told her at any point that the reenactment was voluntary or optional. She also alleged that she was not given *Miranda* warnings before or during the reenactment. Logan alleged that the detectives and DCFS investigators kept her at the apartment for well over an hour. She alleged that the "reenactment" portion of the encounter lasted only five or six minutes, while the remaining time was dedicated to asking her

interrogatory questions unrelated to the reenactment. According to the motion, the police officers then asked Logan for consent to search her home, to which she agreed.

¶ 6 Logan alleged that the circumstances surrounding the reenactment constituted a custodial interrogation in violation of *Miranda* and her fifth amendment right against self-incrimination (U.S. Const., amend. V). On these grounds, Logan requested that the trial court "suppress any and all statements made by [Logan], including any and all video recordings of said reenactment/interview."

¶ 7 In response to the motion to suppress, the State argued that the reenactment and questioning on October 17, 2019, did not constitute a custodial interrogation because the circumstances showed that Logan was not in custody. According to the State, the reenactment bore no indicia of a formal arrest, and Logan voluntarily participated in the reenactment and never asked to leave the premises during the time in question. The State alleged, therefore, that *Miranda* warnings were not required.

¶ 8 On October 15, 2020, the trial court held a hearing on the motion to suppress. Prior to hearing testimony, the judge informed the parties that he had reviewed the pleadings and watched the video of the reenactment. The video was admitted into evidence. The defense then called Tate as its first witness.

¶ 9 Tate, a DCFS investigator in Decatur, Illinois, testified that she was assigned to investigate J.C.'s death. Tate testified that she met with Logan several times during her investigation. She testified that, in one of her conversations with Logan, she

> "basically told [Logan], you know, we need to do a reenactment. We do that in all of our own child death cases. It will be a detective, at least myself and her, where it will be videotaped, and we need to do the reenactment so we can move forward on the investigation."

In response to defense counsel's question as to whether Logan indicated that she did not want to do the reenactment, Tate gave the following testimony:

> "A. I don't recall her saying that she—I know that she was upset about that. She was worried about having to go back into the apartment, and emotionally she was not looking forward to that at all. She didn't really want to do it, but there was no—there was no saying no. She didn't refuse to do it, if that's what you're asking.
>
> Q. Right. But she said she didn't want to do it.
>
> A. Yeah, in a way of saying I don't really want to because I'm not—you know, I don't really want to have to do this because, you know, I don't want to have to go back in the apartment. Her son passed away there. She was very upset."

¶ 10 Tate testified that both she and Detective Matthews "set up" the reenactment but Matthews determined the time and place. Tate testified that she attended the reenactment in her official capacity as a DCFS investigator. On cross-examination by the State, Tate testified that Detective Matthews and another police officer questioned Logan during the reenactment. Tate said she did not recall whether she asked Logan any questions. She testified that she brought Ashley Moffett, another DCFS investigator, to the reenactment for "learning purposes" because Moffett had never been to a reenactment. In response to the State's question asking whether Tate informed Logan of the reason for the reenactment, Tate testified:

"I told her that that's just a process for DCFS and for criminal investigation that both parties would need the reenactment, you know, to be able to better understand what happened in her home that night, you know, so it was best to get this done so we can move forward in the investigation for both DCFS and for criminal."

¶ 11 Hope Taylor testified that she had known Logan for six or seven years, that she was a "mother figure" to her, and that Logan called her "Mom." Taylor testified that J.C. was her biological grandson. She testified that Logan had an individualized education plan (IEP) and attended special education classes during high school. According to Taylor, Logan's IEP granted her special accommodations for learning, including unlimited time for taking tests and having test questions explained to her.

¶ 12 Taylor testified that, after J.C.'s death, Logan and her four-year-old son moved in with her. She stated that she and Logan returned to Logan's apartment only once to pack up some belongings. Taylor testified that she was present for a conversation between Tate and Logan prior to the reenactment. She testified that Tate told Logan "that she would have to do it, and that is normal procedure in a child's death." According to Taylor, Tate told them that Detective Matthews would set up the reenactment. Taylor testified that she accompanied Logan and her son to Logan's former apartment on October 17, 2019. When they arrived, Taylor saw two or three police cars. Taylor testified that five law enforcement officers were present, including Tate, a DCFS trainee, Detective Matthews, and two other police officers. The police officers were wearing badges. Taylor testified that, when she attempted to follow the officers into the apartment, Detective Matthews "kind of just put his hand out and said, 'I think it's best to stay out.' " Taylor said "okay" and stayed outside with her grandson. Taylor testified that she was outside for approximately 45 minutes before Logan and the others came out.

¶ 13 The defense then called Logan to the stand. She testified that she had had an IEP since elementary school because "I have a reading problem and I don't comprehend what's being said." Logan testified that, when Tate told her about the reenactment, she "didn't feel like I had a choice" whether to attend it. She testified that, when Matthews called her to set up the date and time for the reenactment, he told her it was "standard procedure." She testified that she felt upset when she arrived at her former apartment because she did not want to "replay the moment" of her child's death. On cross-examination, Logan testified that she unlocked the door of her apartment for the officers to enter it. She testified that she consented to a search of her apartment and her cell phone. Logan testified that she did not try to leave during the reenactment or tell the officers that she wanted to stop.

¶ 14 The State called Detective Eric Matthews, who testified that he had worked for the Decatur Police Department since 2005. He testified that he was assigned as the lead detective in the investigation of J.C.'s death. He stated that Dr. Scott Denton conducted an autopsy of J.C.'s body on October 7, 2019. According to Detective Matthews, Dr. Denton was unable to determine the cause of death based on the autopsy. Detective Matthews testified that Dr. Denton "requested additional information and further investigation into the incident, including wanting a reenactment done of the incident." Detective Matthews said he subsequently scheduled a reenactment with Logan. He testified that the reenactment did not occur until October 17, 2019, because he had difficulty locating a toddler-sized mannequin to be used in the reenactment. Detective Matthews testified that, in his conversation with Logan, he "explained to her about the request from Dr. Denton to have a reenactment. I asked her if she

would be willing to participate in that and she said that she would." Detective Matthews denied telling Logan that she was required to do the reenactment. He testified that he asked Detective Jeremy Appenzeller to be present to record the reenactment. He testified that Sergeant Carroll[1] was present because he was overseeing the investigation. Detective Matthews testified that Tate asked to attend the reenactment because DCFS was conducting a "parallel investigation" into J.C.'s death.

¶ 15 According to Detective Matthews, he and the other officers wore "dress shirts and dress pants and shoes" at the reenactment and had their badges with them. He testified that he asked Taylor "if she would mind staying outside with the child so that we wouldn't have any distractions while we were doing the reenactment inside." Taylor agreed and stayed outside. Detective Matthews testified that Logan did not indicate that she did not want to participate in the reenactment. The reenactment took place in J.C.'s bedroom. Detective Matthews stated that he was the only person who questioned Logan during the reenactment. He testified that Detective Appenzeller was operating the video camera, Sergeant Carroll was "in and out of the room," and Tate was "in the room for most of the time, kind of standing back by the doorway." Detective Matthews testified that the reason he did not give Logan *Miranda* warnings was because "she wasn't in custody or under arrest." He stated that Logan agreed to let the officers search her house and her cell phone. Detective Matthews testified that Logan did not ask to stop or leave and that the officers did not make any threats or promises to her.

¶ 16 On cross-examination, Detective Matthews testified that he considered Logan to be a suspect in J.C.'s death prior to the reenactment. Thereafter, the trial judge questioned Detective Matthews, and the following colloquy occurred:

"Q. You actually did the reenactment in this case based on your initial conversation with Dr. Denton, correct?

A. Correct.

Q. And that's because Dr. Denton was uncertain regarding some of his initial findings. Is that a fair statement?

A. I believe so.

Q. Okay. Do you do these reenactments in all child death cases?

A. No.

Q. Okay. You did it here because of Dr. Denton's request.

A. Correct.

Q. I'll be frank, I'm a little bit troubled by the process.

Prior to the reenactment, did anybody ever say to [Logan]—now, I understand that she was cooperative and so on—that your responses here could potentially be used against you in a DCFS and/or a murder investigation?

A. I can't speak to the DCFS, but I didn't make those statements to her about the death investigation.

Q. Again, because she had not been arrested, and in your mind she was not in custody.

A. Correct.

---

[1]Sergeant Carroll's first name does not appear in the record.

Q. Have you ever done one of these reenactments before this case?

A. Yes.

Q. Okay.

A. Several.

Q. In several cases where there's uncertainties and you're not quite sure what occurred?

A. Yes."

¶ 17　　After hearing the parties' arguments, the trial court denied the motion to suppress. The court found that *Miranda* was not triggered because the reenactment was not custodial; therefore, no *Miranda* warnings were required. The court made the following factual findings in support of the conclusion that Logan was not in custody:

"[I]t occurred at the defendant's residence with her mother figure really right outside the residence. I don't have any problem with the police officer keeping the mom figure outside of the residence because the other child was there. The defendant voluntarily agreed to the interview and voluntarily traveled there. The interview itself was about 31 minutes. The defendant did not appear to be in any type of emotional distress during the course of the interview. There was no showing of force during the course of the interview, no guns displayed, no badges displayed. At least as far as I could see, Detective Matthews was really very low key and polite as he tends to be. There apparently were three officers present, but it was only Detective Matthews that was conducting the questioning. Again, the mood of the interview was not accusatory, it was low key. He asked straightforward, albeit not forced, questions. There [were] no physical restraints, no handcuffs, no being told you can't leave the room or residence or anything of that nature.

In terms of the defendant's mental state to the Court, she appeared to be of average intelligence. As [the assistant state's attorney] points out, she's 25, held a job, graduated from high school and took care of two children by herself in her own home. She spoke well during the course of the interview. I believe she may have some type of reading disability, but I did not note any type of intelligence disability.

And, finally, she was allowed to leave the house at the conclusion of the interview, was not arrested until six days later, six days later, and, finally, at the conclusion of the interview, she also voluntarily agreed to a consent search of her phone and the residence.

So, again, those are the factors I deem to be important. I do not believe it was a custodial interrogation, although, again, I am somewhat troubled by the process."

¶ 18　　The jury trial began on June 7, 2021. At trial, Decatur police officer Joseph Sawyer testified that he and his partner responded to Logan's apartment in the early morning hours of October 7, 2019. When they arrived, he saw Logan and Taylor, who was holding J.C. Officer Sawyer observed that J.C. was unresponsive, was cold to the touch, and had foam coming out of one of his nostrils. Both Logan and Taylor were crying and appeared to be upset. The responding personnel from the fire department determined that J.C. was deceased and did not perform lifesaving measures. Officer Sawyer testified that he examined the doors and windows and found no signs of forced entry into the apartment. He then interviewed Logan.

¶ 19 According to Officer Sawyer's testimony, Logan stated that she put J.C. to bed at approximately 8 p.m. the previous night and had planned to wake up at 12 a.m. and 2 a.m. to administer breathing treatments to J.C. Logan stated that J.C. had had pneumonia a couple of times and needed breathing treatments when he had a cold. The breathing treatments consisted of albuterol administered through a nebulizer. Logan stated that she had been administering breathing treatments to J.C. twice nightly for the past four nights. Logan told Officer Sawyer that she kept the albuterol in a hall closet. When he asked to see the albuterol, Logan retrieved a box from the closet, but the box was empty. Officer Sawyer testified that his partner conducted a search of the apartment, including the trash cans, but did not find any albuterol. Officer Sawyer also testified to his opinion that Logan appeared to be upset but "it seemed *** forced," and "she mimicked, in my opinion, the sound of crying."

¶ 20 The State entered into the record several photographs of Logan's apartment, which were shown to the jury. An audio recording of Logan's 911 call was entered into evidence and played for the jury. On the recording, Logan told the 911 dispatcher that she performed mouth-to-mouth resuscitation on J.C. The State then resumed its direct examination of Officer Sawyer. He testified that Logan told him that she performed mouth-to-mouth resuscitation and chest compressions on J.C. He also testified that Logan told him she called Taylor before she called 911.

¶ 21 Decatur police officer Justin Closen testified that he was Officer Sawyer's backup officer who responded to the scene. He testified that he conducted a search of Logan's apartment but did not find any vials of albuterol anywhere in the apartment. Officer Closen testified that the trash can in the kitchen was full but that it did not contain any empty vials.

¶ 22 Decatur police officer James Calloway testified that he was trained in extracting data from cell phones. He testified that, on October 16, 2019, he conducted a search of Logan's cell phone, first using software to extract the data, then using other software to analyze the data. The extracted data included Internet searches that were conducted on the cell phone. Officer Calloway concluded from the data extraction that a search of the phrase "how do you suffocate" was done on Logan's cell phone on October 6, 2019, at 8:04 a.m. Officer Calloway testified that he served a search warrant to Google, requesting data associated with Logan's e-mail address. He testified that the data he received from Google matched the data from the cell phone extraction that showed a search for the phrase "how do you suffocate" on October 6, 2019. On cross-examination, Officer Calloway testified that he was not able to determine whether anyone had clicked on the link to the Google search results. He testified that Logan's cell phone records indicated that a call to 911 was made on October 7, 2019, at 3:18 a.m., and a call to Taylor was made approximately one minute earlier.

¶ 23 Dr. Scott Denton, a forensic pathologist at the McLean County Coroner's Office in Bloomington, Illinois, testified that he performed an autopsy of J.C.'s body on October 7, 2019, at 8 a.m. The autopsy revealed no broken bones or fractures. J.C. was wearing a diaper that was "fairly clean." Dr. Denton testified that J.C. appeared healthy and well developed and was in the seventy-fifth percentile for height at age 19 months. He testified that J.C. had "white edema foam," *i.e.*, fluid from the lungs, coming out of his nose. Dr. Denton testified that his further examination showed more edema foam in J.C.'s mouth, which usually indicated "some form of asphyxia or lack of oxygen in the blood, either from congestive heart failure, drowning or asphyxia, things of that nature."

¶ 24    Dr. Denton testified that he observed petechial hemorrhages, or petechia, on J.C.'s eyelids, neck, and both sides of his face. Dr. Denton explained that petechia are "fine red dots on the skin where capillaries have burst," indicating compression of the veins. He explained that the petechia indicated that pressure was applied either to J.C.'s face or to his body below the neck. Dr. Denton further testified that he observed "pressure blanching" on J.C.'s nose and chin, where the skin had turned white. He opined that the pressure blanching was caused by something pressing on J.C.'s nose and chin. Dr. Denton testified that he did not see any petechia on J.C.'s chest or abdomen. In his internal examination, Dr. Denton observed a large amount of white edema foam and fluid in J.C.'s lungs, which indicated asphyxia. J.C. had cerebral edema, or swelling of his brain, which also indicated asphyxia. Dr. Denton testified that all these findings, taken together, were "very indicative of asphyxia and some kind of compression to [J.C.'s] face."

¶ 25    Dr. Denton further testified that he looked at J.C.'s airways and observed that the airways were open and clear. Dr. Denton tested all of J.C.'s organs for microscopic bacteria and viruses, including influenza A and B. All the tests were negative. Dr. Denton testified that he could not find any evidence of wheezing or breathing problems. Following the autopsy, Dr. Denton informed the police that J.C.'s death resulted from asphyxia, possibly caused by suffocation, but that the exact cause of death was open and pending further studies and investigation. Dr. Denton testified that he asked authorities to perform a child death investigation, or "doll reenactment." He testified that such a reenactment was "standard practice" in all child or infant deaths. Dr. Denton testified that the reenactment was subsequently performed, after which he viewed the recording. Dr. Denton gave the following testimony about the recording of the reenactment:

"A. The reenactment looked like the doll was placed face down on a bed. There was a comforter and there was a fitted bedsheet. And it looked like the fitted—the corner of the fitted bedsheet was over the head and then the comforter was over [the] body and [J.C.] was face down in the reenactment.

Q. And you—you watched the video?

A. I did.

Q. And what—did that video provide you with any information that you could use in coming to any conclusions?

A. Um—probably the most important thing is that um—one of the—one of the information I was given was possibly entanglement in bed sheets or there was an entanglement. Well, first of all in a 19 month old that's very difficult. I don't—I've never heard of a 19 month old getting entangled and then dying in bed sheets, especially a large 19 month, who's at 75th percentile.

And then, so the reenactment showed me that, basically, he was face down. There was a comforter. There was a corner of a bed sheet. And that to me did not account for his death. They could not have killed him in that position that was shown on the video.

Q. Did you, ultimately, were you able to conclude what the cause of death was?

A. I did. So, based on everything I put together, and then I went to the medical records too, so I got—I asked the coroner to provide me medical records. He provided me what he could. I went through all the medical records for [J.C.] And I came to cause of death as asphyxia due to smothering and compression of the neck.

Q. And is that opinion within a reasonable degree of medical and scientific certainty?

A. Yes."

¶ 26 Dr. Denton testified that he was not able to determine exactly how J.C. suffocated, but he explained that there were two possibilities:

"He could be face down and being pushed downward with compression of the neck and the back of the head, which will account for all the findings I saw.

He could also be face up with something called soft suffocation, which either can be a folded up comforter or a pillow that can be pushed down on the person's face. But either one of those is possible and I can't say which one is more likely."

¶ 27 Dr. Denton testified that he ruled out the following possible causes of J.C.'s death based on a lack of physical evidence: strangulation, drowning, choking on an object, an allergic reaction, or someone physically pinching J.C.'s nose or mouth shut. Dr. Denton concluded that J.C.'s four-year-old brother could not have suffocated J.C. because he would not have had the strength to do it.

¶ 28 Detective Matthews testified that he obtained recordings of telephone calls that were made between Logan and Shawneen Comage, J.C.'s father, who was incarcerated in the Illinois Department of Corrections. Detective Matthews then gave the following testimony regarding the reenactment that occurred on October 17, 2019:

"Q. What was the next thing you had done in the course of your investigation?

A. I obtained a toddler size mannequin for use in the reenactment with Jessica Logan. Then I contacted her by phone and asked her to perform the reenactment at her apartment and she agreed."

The court entered into evidence the recording of the reenactment, which consisted of two compact discs, and the recording was played for the jury. In the video, Logan demonstrated the position in which she found J.C.'s body by placing the mannequin face down on the bed with a corner of the fitted sheet pulled over its head. Detective Matthews then testified that Logan stated during the reenactment that she did not perform mouth-to-mouth resuscitation or cardiopulmonary resuscitation on J.C. He further testified that he searched the apartment after the reenactment and did not find any albuterol.

¶ 29 Angela King, a pediatric nurse practitioner at Crossings Healthcare, testified that she had treated J.C. since September 2018. She testified that J.C. had several instances of bronchiolitis in 2018, including one caused by respiratory syncytial virus (RSV). King stated that she last refilled J.C.'s prescription for albuterol in January 2019. She testified that she had seen J.C. on September 9, 2019, for a well-child examination. King testified that J.C. presented for his examination with a sore throat and a cough, but no runny or stuffy nose, and his lungs were clear. She testified that she had reviewed J.C.'s medical records from other medical facilities, which indicated that J.C. had had at least one pneumonia infection.

¶ 30 The State next presented a written stipulation agreed to by the parties. It stated that Rachel Niemerg would testify that (1) on August 2, 2019, Logan took out a personal loan in the amount of $1075 from the Cash Store; (2) the loan required repayments of $202.57 to be deposited automatically from Logan's bank account every two weeks; (3) the Cash Store received a " 'return' " from Logan's bank indicating that payment had been declined for the first, second,

fourth, and fifth repayment dates; (4) Logan came to the Cash Store on September 12, 2019, and made a partial payment of $100; (5) Niemerg and the previous store manager called Logan and left her multiple messages in an attempt to work out repayment; (6) Logan made appointments to pay in person at the Cash Store on August 15, September 3, September 6, September 20, September 27, October 4, and October 11, 2019, but she did not appear at those appointments; and (7) one day, Logan came into the store to make a partial payment using a card but the card was declined. The State published several voicemail messages from the Cash Store that were extracted from Logan's cell phone.

¶ 31 The State next published 12 portions of recorded telephone calls between Logan and Comage, J.C.'s incarcerated father, that took place between May 8 and October 2, 2019. In the recordings, Logan told Comage, among other things, that she had several hundred dollars in unpaid bills and did not know how she was going to pay them. She stated that her bank account was "overdrawn," and she did not know how she was going to repay her $1000 loan, of which she sent Comage a $400 portion. In a telephone call with Comage on September 3, 2019, Logan stated that she had been "stressing" about how she was going to pay her bills totaling several hundred dollars, which included J.C.'s life insurance premium. Comage told her that he could send funds to cover the life insurance premium because "that's the main thing that needs to be paid." Logan said she would "figure something out." In a telephone call on September 12, 2019, Logan told Comage that she "literally broke down" due to her unpaid bills and was unable to pay her rent. The recorded telephone calls also included multiple statements by Comage asking Logan to send him money.

¶ 32 The last witness in the State's case was Patrick Delatte, an owner of an American Family Insurance agency. He testified that in December 2018, Logan contacted him to take out a life insurance policy for J.C. The policy went into effect on December 14, 2018. Delatte testified that the policy was a whole life insurance policy in the amount of $25,000. The premiums were $35 per month, and there were no lapses in the policy. He testified that, on the morning of October 7, 2019, Logan called him "to let us know that the child had passed away and to turn in the life insurance claim." On cross-examination, Delatte testified that he simply reported J.C.'s death to American Family Insurance, and he had no knowledge about whether the claim was paid out. The State then rested its case.

¶ 33 The defense called Michael Day, the Macon County Coroner, as its first witness. Day testified that he informed Logan that there were funeral homes in the area that could help with J.C.'s funeral. He testified that Logan told him that they did not need to worry about that. He testified that he learned from Logan's family that they would seek out a distant cousin who worked for a funeral home to help with the funeral.

¶ 34 Taylor testified that she "took in" Logan after Logan's mother died, about eight years ago, to help "get her on the right track" and make sure she graduated from high school. Taylor testified that, after her son was incarcerated, she helped Logan by babysitting her children and offering transportation. She also helped Logan financially, paying for groceries or things that Logan or the children needed. Taylor testified that, on the evening before J.C. died, she picked up Logan and the children and took them to Walmart so that Logan could buy socks for the children. Taylor stated that, shortly after 3 a.m. the next morning, Logan called her and told her that, when she woke up to give J.C. his breathing treatment, she found that J.C. was not breathing. Taylor testified that she told Logan to hang up and call 911. Taylor then went to

- 10 -

Logan's apartment. Taylor testified that she later told Logan to call the insurance company because Taylor thought they needed the life insurance money to pay for the funeral. She testified that correspondence from the insurance company was mailed to her house. According to Taylor, she gave the correspondence to Logan, who put it on the dresser in the bedroom where she was staying. Taylor testified that Logan never opened the envelope. She testified that Logan never asked for, nor did she receive, any monetary compensation from the insurance company.

¶ 35 Logan, who took the stand in her own defense, testified that she was diagnosed with attention-deficit/hyperactivity disorder and began receiving Social Security disability benefits when she was five years old. She testified that she attended special education classes and had trouble reading and comprehending written words. Logan stated that her mother passed away when she was a freshman in high school. After graduating from high school in 2012, Logan attended Richland Community College, but she stopped attending after she suffered a miscarriage and never received a degree. Logan testified that she moved in with Taylor when she was 17 years old. Logan testified that when her older son was two months old, Taylor purchased life insurance policies for both Logan and her son. After J.C. was born, Taylor offered to buy a life insurance policy for J.C., but Logan refused the offer and purchased the policy herself. She testified that she did so because she "wanted some type of responsibility."

¶ 36 Logan testified that on October 6, 2019, she put her children to bed at approximately 8:30 p.m. She stated that, before putting them to bed, she prepared J.C.'s 12 a.m. breathing treatment by loading a tube of albuterol into the nebulizer machine. Logan testified that she had recurring alarms set for 12 a.m. and 3 a.m. to administer breathing treatments to J.C., as she had done the previous three or four nights. She stated that the albuterol treatments were prescribed to be given "as needed." Logan testified that she slept through her 12 a.m. alarm and woke up at 3 a.m. She testified that she found J.C. lying in his bed on his stomach and that his body was "cold and hard" and "stiff." She testified that she thought there was nothing she could do, so she did not try to perform cardiopulmonary resuscitation. She picked up J.C., went to get her cell phone, and called Taylor. Logan testified that she called Taylor before calling 911 because she was "in shock" and "panicked." She stated that she "knew he was already gone" because J.C.'s body felt like her mother's body after her mother died of cancer.

¶ 37 Logan testified that after the coroner had taken J.C.'s body away on the morning of October 7, 2019, she went with Taylor to Taylor's house. She said other family members were gathered at the house and they were discussing how J.C. could have passed away. She testified that Taylor's daughter mentioned the word "suffocation," so she searched Google on her cell phone for the phrase "how do you suffocate." She testified that she never clicked on the link. Logan testified that she was concerned about how she was going to pay for J.C.'s funeral. She said she called American Family Insurance about J.C.'s life insurance policy because she was concerned about funeral expenses. Later, she learned that the funeral would be free of charge due to J.C.'s age. Logan testified that she subsequently received a packet in the mail from American Family Insurance, but she never opened the packet. She testified that she did not want the insurance money because it was not going to bring her son back.

¶ 38 Logan testified that on October 17, 2019, she received a call from Detective Matthews asking her to meet him and Tate at her house to do a reenactment. She agreed to do the reenactment, which, in her mind, meant replaying the moment in her head of how she found

J.C. on the night he died. She testified that she felt "emotional" and "didn't really feel up to it" at the time of the reenactment. She testified that she consented to a search of her apartment and her cell phone because she had nothing to hide.

¶ 39 On cross-examination, Logan denied making any searches on her cell phone on October 6, 2019. She testified that she had no explanation for why the search for "how do you suffocate" was recorded as occurring on October 6, 2019. She testified that she never missed a payment for J.C.'s life insurance premium because it was "an important bill" that was for her child.

¶ 40 After Logan's testimony, the defense rested its case. Following closing arguments, the jury convicted Logan of first degree murder. The trial court subsequently sentenced her to 33 years in prison.

¶ 41 Logan filed a posttrial motion requesting a new trial or, alternatively, a judgment notwithstanding the verdict. The motion presented two grounds: (1) the State failed to prove Logan guilty beyond a reasonable doubt, and (2) the trial court erred in not allowing Leandra Tate, the investigator assigned to the DCFS case, to testify about any opinions she may have had that were relevant to the criminal case. The trial court denied the posttrial motion.

¶ 42 On appeal, Logan argued that the trial court erred in denying her motion to suppress evidence, where no law enforcement officer admonished her as to her fifth amendment rights prior to the reenactment, and she was denied the effective assistance of counsel.

¶ 43 The appellate court affirmed the trial court's judgment. 2022 IL App (4th) 210492. On the first issue, the appellate court agreed with the trial court that the circumstances surrounding the reenactment were "troubling." *Id.* ¶¶ 83-85. Nevertheless, after weighing various factors, the court concluded that a reasonable person who was innocent of any crime would have believed she could terminate the encounter and leave. *Id.* ¶¶ 76-83. The court therefore held that the trial court correctly ruled that Logan was not in custody during the reenactment and the officers were not required to give her *Miranda* warnings. *Id.* ¶¶ 83, 86.

¶ 44 Next, the appellate court addressed, and rejected, Logan's claims that her defense counsel rendered ineffective assistance. *Id.* ¶¶ 87-144. Logan argued, among other things, that her trial counsel was ineffective for failing to argue in the motion to suppress that her statements and actions during the reenactment were involuntary in violation of the fifth amendment (U.S. Const., amend. V) and that she was seized in violation of the fourth amendment (U.S. Const., amend. IV). 2022 IL App (4th) 210492, ¶¶ 87-108. The appellate court held that these ineffective assistance claims lacked merit because, based on the relevant factors, Logan's recorded statements were voluntary under the fifth amendment (*id.* ¶ 98) and she was not subject to a seizure under the fourth amendment (*id.* ¶ 108).

¶ 45 This court allowed Logan's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2021).

¶ 46                                         ANALYSIS

¶ 47 In this court, Logan argues that the trial court erred in denying her motion to suppress because she was in custody during the reenactment and should have received *Miranda* warnings. She also argues that her trial counsel rendered ineffective assistance by failing to (1) raise a claim that the reenactment video violated her fifth amendment rights, (2) raise a claim that the reenactment video violated her fourth amendment rights, and (3) request the redaction of exhibits to ensure the jury did not hear irrelevant, prejudicial statements that she

made during the reenactment video and in recorded telephone calls.

¶ 48                                I. *Miranda* violation
¶ 49                                A. Forfeiture
¶ 50        Before proceeding to the merits, we note that Logan forfeited her *Miranda* argument by failing to raise it in her posttrial motion. See *People v. McCarty*, 223 Ill. 2d 109, 122 (2006) ("In general, the failure to raise an issue in a posttrial motion results in the forfeiture of that issue on appeal."). Where a defendant fails to comply with the requirement to preserve an error in a posttrial motion, a reviewing court may not review the issue unless it (1) alleges a constitutional violation, (2) challenges the sufficiency of the evidence, or (3) amounts to plain error. *People v. Enoch*, 122 Ill. 2d 176, 190 (1988). Logan contends that, at the time of her trial, an alleged *Miranda* violation was considered "constitutional" in nature. Therefore, her *Miranda* claim is subject to harmless error review despite not being preserved in her posttrial motion. We disagree.

¶ 51        The relevant case law clearly holds that a *Miranda* violation itself is not a constitutional violation. In *People v. Winsett*, 153 Ill. 2d 335, 353 (1992), this court held that "*Miranda* warnings are not constitutional rights, but are simply prophylactic measures designed to safeguard a suspect's fifth amendment rights." *Id.* (citing *Michigan v. Tucker*, 417 U.S. 433 (1974), and *Oregon v. Elstad*, 470 U.S. 298 (1985)). The United States Supreme Court also has held that a violation of *Miranda* is not a violation of a constitutional right. See *Vega v. Tekoh*, 597 U.S. 134, 150 (2022) ("In sum, a violation of *Miranda* does not necessarily constitute a violation of the Constitution, and therefore such a violation does not constitute 'the deprivation of [a] right . . . secured by the Constitution.' 42 U.S.C. § 1983.").

¶ 52        Logan argues, however, that at the time of her trial in June 2021, a claim alleging a *Miranda* violation was "arguably" constitutional, based on *Dickerson v. United States*, 530 U.S. 428, 444 (2000), in which the United States Supreme Court expressly stated that "*Miranda* announced a constitutional rule."[2] Logan also argues that her counsel reasonably could have believed, based on *Dickerson*, that the *Miranda* issue was sufficiently preserved by Logan's pretrial motion to suppress; therefore, this court should not treat the claim as forfeited. These arguments are not well taken. As the Court explained in *Vega*, *Miranda* and its progeny "make clear that *Miranda* imposed a set of prophylactic rules. Those rules, to be sure, are 'constitutionally based,' *Dickerson*, 530 U. S., at 440, but they are prophylactic rules nonetheless." *Vega*, 597 U.S. at 142. Consequently, Logan's arguments that her *Miranda* claim was not forfeited or can be reviewed as a violation of a constitutional right are unfounded.

¶ 53        Logan argues, alternatively, that the trial court's denial of her motion to suppress amounts to plain error. Under the plain error doctrine, a reviewing court may address a forfeited claim in two circumstances:

----

[2]At issue in *Dickerson* was a federal statute that prescribed that statements made during a custodial interrogation were inadmissible only if they were made involuntarily, regardless of whether *Miranda* warnings were given. *Dickerson*, 530 U.S. at 432. The Court held that "*Miranda*, being a constitutional decision of this Court, may not be in effect overruled by an Act of Congress, and we decline to overrule *Miranda* ourselves." *Id.* Therefore, the Court held, *Miranda* and its progeny continued to "govern the admissibility of statements made during custodial interrogation in both state and federal courts." *Id.*

"(1) where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error and (2) where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Belknap*, 2014 IL 117094, ¶ 48. The first step in applying the plain error doctrine is to determine whether error occurred. *People v. Smith*, 2016 IL 119659, ¶¶ 38-39.

¶ 54                                    B. Standard of Review

¶ 55        In determining whether the trial court erred in denying a motion to suppress, we accord great deference to its findings of fact and credibility determinations. *People v. Slater*, 228 Ill. 2d 137, 149 (2008). We will reverse the trial court's factual findings only if they are against the manifest weight of the evidence. *Id.* "We review *de novo*, however, the ultimate question posed by the legal challenge to the trial court's ruling on a suppression motion." *Id.* It is appropriate to consider the testimony adduced at trial as well as at the suppression hearing in making this determination. *Id.*

¶ 56                         C. Custodial Interrogation Under *Miranda*

¶ 57        The fifth amendment to the United States Constitution states that "[n]o person *** shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. In *Miranda*, the United States Supreme Court held that the fifth amendment privilege against self-incrimination applied not only in court but in any place a person faces custodial interrogation. *Miranda*, 384 U.S. at 444. The Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* To protect this right, the Court held that the prosecution may not use statements made by a defendant during a custodial interrogation, whether inculpatory or exculpatory, unless those statements are accompanied by certain procedural safeguards, now known familiarly as "*Miranda* warnings":

> "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." *Id.* at 444-45.

¶ 58        The purpose of *Miranda* warnings is to "ensure that the accused is aware of his substantive constitutional right not to incriminate himself and to provide him with the opportunity to exercise that right." *Winsett*, 153 Ill. 2d at 348. A statement taken in violation of *Miranda* may not be admitted as substantive evidence in the prosecution's case-in-chief. *Id.* at 350. This

- 14 -

"*Miranda* exclusionary rule *** applies even if the defendant's constitutional rights under the fifth amendment were not violated." *Id.* at 352. Therefore, although a statement taken in violation of *Miranda* is prohibited from being used in the prosecution's case-in-chief, it is not subject to the "fruit of the poisonous tree" doctrine unless the statement was not voluntary within the meaning of the fifth amendment. *Id.* at 352-54.

¶ 59　　The determination of whether a person is "in custody," necessitating that *Miranda* warnings be given, involves " '[t]wo discrete inquiries ***: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.' " *People v. Braggs*, 209 Ill. 2d 492, 505-06 (2003) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). The second inquiry is an objective one. *In re D.L.H.*, 2015 IL 117341, ¶ 50. It asks "what a reasonable person, innocent of any crime, would have thought had he or she been in the defendant's shoes." *Braggs*, 209 Ill. 2d at 506.

¶ 60　　The following nonexclusive factors are relevant in determining whether an interrogation took place in a custodial setting:

> "the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused." *Slater*, 228 Ill. 2d at 150.

An officer's belief in the individual's guilt is relevant only to the extent that "the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." *Stansbury v. California*, 511 U.S. 318, 325 (1994). Other factors that courts have deemed relevant to the custody analysis include "whether and to what extent the person has been made aware that he is free to refrain from answering questions" and "the degree of police control over the environment in which the interrogation takes place, and in particular whether the suspect's freedom of movement is physically restrained or otherwise significantly curtailed." *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996). No single factor is dispositive, and a court should consider the totality of the circumstances, weighing all relevant factors, before determining whether a person was in custody. *People v. Wyma*, 2020 IL App (1st) 170786, ¶ 57.

¶ 61　　After reviewing the video of the reenactment and the testimony at the suppression hearing and trial, we conclude under the specific circumstances of this case that Logan was subjected to a custodial interrogation. At the outset, we find that the reenactment constituted an interrogation, a fact the parties do not dispute. An "interrogation," for purposes of *Miranda*, "refers both to express questioning and to any words or actions on the part of the police, other than those normally accompanying arrest and custody, that the police should know are reasonably likely to elicit an incriminating response from the suspect." *People v. Olivera*, 164 Ill. 2d 382, 391-92 (1995). The video confirms that Detective Matthews questioned Logan about the circumstances surrounding J.C.'s death for nearly the entire duration of the reenactment. Thus, an interrogation took place.

¶ 62        Turning to the custody issue, we find the following factors support the conclusion that the interrogation was custodial. First, Detective Matthews chose the date and location for the reenactment, selecting a place where Logan did not want to go because it was personally upsetting for her. The reenactment took place in Logan's former apartment in the room where J.C. had died. Logan was no longer living in the apartment. She had moved in with Taylor after J.C.'s death and had only been back to her apartment once to retrieve some belongings. Logan testified that she was "emotional" and felt upset when she arrived at the location of the reenactment because she did not want to "replay the moment" of her child's death. Tate corroborated Logan's testimony, testifying that Logan was "very upset" and "worried about having to go back into the apartment, and emotionally *** was not looking forward to that at all."

¶ 63        Another factor that weighs in favor of finding custody is that Logan was told that she "had" to participate in the reenactment and was not informed that her participation was optional. See, e.g., *People v. Brown*, 136 Ill. 2d 116, 127 (1990) (holding that the language used by authorities to summon the defendant for questioning was "more of an imperative than a request," contributing to the conclusion that the defendant was in custody). Logan testified that she "didn't feel like I had a choice" whether to attend the reenactment. Taylor testified that Tate told Logan "that she would have to do it, and that is normal procedure in a child's death." Tate testified that she told Logan, "we need to do a reenactment. We do that in all of our own child death cases. *** [W]e need to do the reenactment so we can move forward on the investigation." Tate further testified that Logan "didn't really want to do it, but there was no *** saying no." There was no testimony that anyone told Logan she did not have to participate in the reenactment.

¶ 64        Next, Logan was not informed that she was free to leave the interrogation or refuse to answer Detective Matthews's questions. "[W]hether the suspect was informed that he was free to leave and that answering the interrogator's questions was voluntary" is a relevant factor in determining whether an interrogation was custodial. *United States v. Anaya*, 715 F. Supp. 2d 916, 946-47 (D. S.D. 2010); see *Brown*, 136 Ill. 2d at 126 (finding custody where the defendant was not informed that he could leave if he so desired or that he was not being held). Furthermore, Logan testified that, after the reenactment was finished, she was "allowed to leave" the apartment. This evidence suggests that Logan did not leave of her own volition but left only when the police officers released her from their custody.

¶ 65        A key factor in our custody analysis is the number of law enforcement officers and authority figures who were present during the interrogation. The evidence shows that three police officers and two DCFS investigators were present in the apartment. The video and testimony indicate that at least two officers and one DCFS investigator were in the bedroom with Logan during the reenactment. Detective Matthews conducted the questioning, while another detective operated the video camera. The fact that Logan was questioned in the presence of three police officers, as well as two DCFS investigators, weighs in favor of finding that she was in custody for purposes of *Miranda*.

¶ 66        Moreover, the evidence that Taylor, Logan's "mother figure," was kept outside during the interrogation adds further weight to our custody determination. See *United States v. Griffin*, 922 F.2d 1343, 1352 (8th Cir. 1990) ("A frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues who

might lend moral support during the questioning and deter a suspect from making inculpatory statements, an established interrogation practice noted by the *Miranda* [C]ourt."). The evidence shows that Taylor attempted to follow Logan and the officers into the apartment but was stopped by Detective Matthews and asked to wait outside. Taylor was not allowed to enter the apartment or be present during the reenactment. As a result, Logan was separated from the family member who had accompanied her and was alone in the apartment with five authority figures, including police officers and DCFS investigators. Although we agree with the trial court that it was rational for Detective Matthews to ask Taylor to wait outside with Logan's four-year-old son, this factor still bears on the question of whether a reasonable person in these circumstances would have felt free to terminate the interrogation and leave. See *Braggs*, 209 Ill. 2d at 505-06, 508.

¶ 67    A related factor that we find relevant to our custody analysis is the degree of control the police exerted over the interrogation surroundings. "An interrogation which occurs in an atmosphere dominated by the police *** is more likely to be viewed as custodial than one which does not." *Griffin*, 922 F.2d at 1351-52. Circumstances that evince police domination include "whether the police assume control of the interrogation site and 'dictate the course of conduct followed by the [suspect]' or other persons present at the scene." *Id.* at 1352 (quoting *United States v. Jones*, 630 F.2d 613, 616 (8th Cir. 1980)). The evidence shows that Detective Matthews exerted a high degree of control over the circumstances of the reenactment and the interrogation. He chose the location, date, and time for the reenactment. He directed Taylor to wait outside. During the reenactment, Detective Matthews, another officer, and a DCFS investigator stood inside the bedroom while Logan sat on J.C.'s bed or stood beside it. Detective Matthews gave Logan a toddler-sized doll and directed her actions in recreating J.C.'s death. He instructed her to place the doll in J.C.'s bed in the same position in which Logan found J.C. on the morning of his death. He instructed Logan to use the doll to demonstrate how she held J.C. after finding his body. He also directed Logan to use the doll and the nebulizer machine to demonstrate how she usually administered breathing treatments to J.C. Detective Matthews questioned Logan continuously throughout the reenactment. When Detective Matthews finished questioning Logan, he asked her to sign a written waiver allowing the police to search the apartment. The recording ended at that point, indicating that the formal interrogation had concluded. The videotaping of the event contributed to the atmosphere of formality and police control over the scene, including the interrogation.

¶ 68    We take note of the trial court's factual findings that (1) Logan agreed to participate in the reenactment and traveled there voluntarily; (2) the interrogation was of relatively short duration; (3) there was no showing of force or physical restraint by the officers; (4) the mood of the interview was straightforward and not openly accusatory; (5) Logan's age, intelligence, and mental makeup did not bear on the custody analysis; and (6) Logan was allowed to leave the apartment at the conclusion of the reenactment and interrogation. While we do not find that any of these facts were against the manifest weight of the evidence, we disagree with the trial court's conclusion based on these factors that Logan was not in custody.

¶ 69    Although this is a close case, we find that the evidence that Logan was told she "had" to participate in the reenactment and was not told she was free to leave or that she had an option *not* to participate, in combination with the police exerting a high degree of control over the surroundings, barring a family member from the apartment, and interrogating Logan by herself in the presence of five law enforcement agents while the proceedings were being videotaped,

would have led a reasonable person in Logan's shoes to believe she was not at liberty to end the interrogation and leave. See *In re D.L.H.*, 2015 IL 117341, ¶ 51. Based on the totality of the circumstances, we conclude that Logan was in custody during the reenactment and interrogation, and the police were required to advise her of her *Miranda* rights prior to interrogating her. Accordingly, we hold that Logan's motion to suppress should have been allowed and the trial court erred in admitting the recording of the reenactment into evidence at her trial.

¶ 70                                   D. First Prong Plain Error

¶ 71    Logan argues that the trial court's denial of her motion to suppress amounted to plain error pursuant to the first prong of the plain error doctrine. Under the first plain error prong, a forfeited error is reviewable "where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." *Belknap*, 2014 IL 117094, ¶ 48. If a defendant satisfies this standard, the error is "actually prejudicial," not merely presumptively prejudicial. *People v. Herron*, 215 Ill. 2d 167, 193 (2005). To determine whether the evidence at trial was closely balanced, we "must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53.

¶ 72    Dr. Denton testified to his findings based on an autopsy of J.C.'s body that he conducted on October 7, 2019. He testified that J.C. had cerebral edema and white edema foam inside his nose, mouth, and lungs, which indicated that J.C. had been asphyxiated. He testified that J.C. had petechia on his eyelids, face, and neck and pressure blanching on his nose and chin. Dr. Denton testified that the petechia and pressure blanching were indicative of compression having been applied to J.C.'s face. He testified that the physical findings ruled out a bacterial or viral infection, strangulation, drowning, choking, an allergic reaction, or someone pinching J.C.'s mouth or nose shut, as the cause of J.C.'s death. After viewing the reenactment, in addition to reviewing J.C.'s medical records, Dr. Denton did not change his opinion but rather narrowed his conclusion regarding J.C.'s cause of death. Dr. Denton concluded, within a reasonable degree of medical and scientific certainty, that the cause of J.C.'s death was "asphyxia due to smothering and compression of the neck," either from downward pressure applied to him while he was face down or pressure applied by a comforter or pillow while he was face up. Dr. Denton concluded that J.C.'s four-year-old brother could not have suffocated him because he would not have been strong enough to do it.

¶ 73    Logan testified that she had been administering albuterol to J.C. for several days prior to his death and was planning to administer two albuterol treatments to J.C. in the early morning hours of October 7, 2019. The police officers who searched the apartment testified, however, that they did not find any albuterol vials in the apartment.

¶ 74    Officer Calloway testified that he extracted and analyzed data from Logan's cell phone and found that a Google search of the phrase "how do you suffocate" had been conducted on her cell phone on October 6, 2019, at 8:04 a.m., before J.C. died. Officer Calloway obtained data from Google through a search warrant that confirmed the content, date, and time of the Google search. Logan admitted searching the phrase "how do you suffocate" on her cell phone, but she testified that she conducted the search on October 7, 2019, after J.C. died. Logan testified

that she could not explain why the data extraction results showed that the search occurred on October 6, 2019.

¶ 75    The State introduced evidence that Logan was having financial problems for at least several months prior to J.C.'s death. The evidence showed that Logan had taken out a personal loan from the Cash Store on August 2, 2019, in the amount of $1075, which she had not repaid according to her agreement. In recorded telephone calls with Comage, Logan stated that she was worried about her unpaid bills, which amounted to several hundred dollars, and she was having trouble paying her rent. During the telephone calls, Comage repeatedly asked Logan to send him money in prison. Logan and Comage discussed the monthly premiums for J.C.'s life insurance policy in a telephone call on September 3, 2019. In that call, Comage stated that the life insurance premium was "the main thing that needs to be paid," and Logan responded that she would "figure something out."

¶ 76    Patrick DeLatte testified that Logan had purchased a life insurance policy for J.C. in December 2018, when J.C. was approximately nine months old. He testified that the policy premiums were $35 per month and there were no lapses in the policy. DeLatte testified that Logan called him on the morning of October 7, 2019, to inform him of J.C.'s death and "to turn in the insurance claim." Logan testified that she purchased the life insurance policy for J.C. because Taylor had purchased a policy for Logan's older son and Logan wanted to take responsibility for her child. Logan testified that she never missed paying the monthly premium because it was an "important bill" that was for her child. Both Logan and Taylor testified that Logan received paperwork from the insurance company in the mail but never opened it.

¶ 77    Considering the totality of the evidence presented at trial, we conclude that the evidence in this case was not closely balanced but was overwhelmingly in favor of guilt. The State presented substantial, compelling circumstantial evidence of Logan's guilt that the defense, for the most part, did not refute. Thus, we hold that the appellate court did not err in affirming the trial court's judgment, although the appellate court did so on a different ground.

¶ 78                              E. Second-Prong Plain Error

¶ 79    Logan argues, alternatively, that the *Miranda* violation amounted to second-prong plain error, "where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Belknap*, 2014 IL 117094, ¶ 48. Second-prong plain errors equate to "structural errors," or errors that "affect the framework within which the trial proceeds, rather than mere errors in the trial process itself." *People v. Moon*, 2022 IL 125959, ¶¶ 28-29. Structural errors are subject to automatic reversal only in a limited class of cases, which include "a complete denial of counsel, denial of self-representation at trial, trial before a biased judge, denial of a public trial, racial discrimination in the selection of a grand jury, and a defective reasonable doubt instruction." *Id.*

¶ 80    Logan contends that the *Miranda* violation in this case seriously affected the fairness and integrity of her trial because "the record supports many troubling inferences about law enforcement's actions in obtaining the reenactment video." She relies on *United States v. Stewart*, 388 F.3d 1079, 1090-91 (7th Cir. 2004) (discussing *Missouri v. Seibert*, 542 U.S. 600 (2004)), where the court held that the admission of a confession resulting from a "deliberate" two-step interrogation technique, "in which *Miranda* warnings are intentionally withheld until

after the suspect confesses," is an error that seriously affects the fairness and integrity of a trial. The present case is distinguishable from *Stewart* in that there was no evidence that the police intentionally used an interrogation technique specifically designed to evade *Miranda*. Logan cites no other authorities to support her claim that a violation of *Miranda* constitutes a structural error that undermines the integrity of the judicial process. Generally, a *Miranda* claim that has been properly preserved is subject to harmless error review. See, *e.g.*, *People v. R.C.*, 108 Ill. 2d 349, 355-56 (1985); *People v. Wilson*, 2020 IL App (1st) 162430, ¶ 57; *United States v. Lee*, 413 F.3d 622, 627 (7th Cir. 2005). An error that is amenable to harmless error analysis is not a structural error. See *People v. Jackson*, 2022 IL 127256, ¶ 37. Accordingly, Logan's argument that the *Miranda* violation in this case amounts to second-prong plain error is without merit.

¶ 81                                    II. Ineffective Assistance

¶ 82        Logan next argues that her trial counsel rendered ineffective assistance by failing to include arguments based on the fifth and fourth amendments in her motion to suppress and failing to request redactions of certain exhibits. We address claims alleging ineffective assistance of counsel according to the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Cathey*, 2012 IL 111746, ¶ 23. Under *Strickland*, a defendant alleging ineffective assistance of counsel must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Id.* (citing *Strickland*, 466 U.S. at 687). "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 83        To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy both prongs of the *Strickland* test. *People v. Simpson*, 2015 IL 116512, ¶ 35. The failure to satisfy either of the prongs is fatal to the claim. *Id.* Accordingly, if a reviewing court determines that the defendant has failed to prove prejudice, the court need not address the deficient performance prong. *Strickland*, 466 U.S. at 697; *People v. Givens*, 237 Ill. 2d 311, 331 (2010).

¶ 84        Logan contends that her counsel was ineffective for failing to argue a fifth amendment violation in her motion to suppress. The fifth amendment prohibits the use of compelled or involuntary statements. *Winsett*, 153 Ill. 2d at 357. "The test for voluntariness is 'whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed.' " *Slater*, 228 Ill. 2d at 160 (quoting *People v. Gilliam*, 172 Ill. 2d 484, 500 (1996)). Compelled or involuntary statements obtained in violation of the fifth amendment are barred from being used at trial, "not as a means of deterring unlawful police conduct, but because such statements are regarded as inherently untrustworthy and, thus, not probative." *Winsett*, 153 Ill. 2d at 352. A violation of the fifth amendment is subject to the "fruit of the poisonous tree" doctrine. See *United States v. Terzado-Madruga*, 897 F.2d 1099, 1113 (11th Cir. 1990) (citing *Kastigar v. United States*, 406 U.S. 441 (1972)).

> "[T]he fruit of the poisonous tree doctrine applies only where the police violate a defendant's constitutional rights, for example, by conducting an unconstitutional

search, arrest or interrogation. The constitutional violation is termed the 'poisonous tree' and any evidence which the State obtains by exploitation of that constitutional violation is subject to suppression as the 'fruit' of that poisonous tree." *Winsett*, 153 Ill. 2d at 351.

¶ 85 We need not reach the question of whether defense counsel's performance was deficient for failing to raise a fifth amendment violation because we find that Logan cannot satisfy the prejudice prong of *Strickland*. Logan argues that a successful fifth amendment challenge would have required the trial court to suppress not only the reenactment video but also the portions of Dr. Denton's testimony that were derived from the reenactment video as fruit of the poisonous tree. Even if this evidence were excluded, however, it would not have changed the outcome of the trial, as the remaining evidence of guilt was overwhelming. Dr. Denton's testimony that, in his opinion, the only possible cause of J.C.'s death was asphyxia caused by smothering was primarily based on his autopsy findings, not the reenactment video. The only portions of his testimony that referred to the reenactment were his opinions that J.C.'s death occurred on the bed, based on Logan's statement that she found J.C.'s body there, and that J.C.'s death could not have resulted from becoming entangled in bed sheets as Logan demonstrated in the video. The video also aided Dr. Denton in narrowing his opinion regarding J.C.'s cause of death. Had those portions been excluded, Dr. Denton's testimony that in his opinion J.C. died from asphyxia, possibly caused by suffocation, based on the edema fluid, petechia, and pressure blanching on his body, would have been admitted. His testimony that J.C.'s older brother could not have caused J.C.'s asphyxia also would have been admitted. This evidence of guilt, along with the evidence concerning the Google search and life insurance policy, ample evidence of a financial motive, and a lack of evidence that anyone other than Logan could have suffocated J.C., was overwhelming. Consequently, Logan has not established a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

¶ 86 The same prejudice analysis applies to Logan's argument that her trial counsel rendered ineffective assistance by failing to allege that the reenactment was the product of an illegal seizure under the fourth amendment. See U.S. Const., amend. IV ("[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated"). As we have explained, Logan cannot satisfy the prejudice prong under *Strickland* because the evidence of her guilt was overwhelming, even if the reenactment video and the testimony relying on the reenactment video had been suppressed by the trial court.

¶ 87 Logan's final argument is that her trial counsel was ineffective for failing to request the redaction of exhibits to ensure the jury did not hear irrelevant, overly prejudicial statements. First, she argues that counsel should have sought redaction of her statement during the reenactment video "that she took J.C. to the hospital when he was about two months old because he had a bump on his head, at which point, 'DCFS got called' and they created a 'safety plan,' " despite later dropping the case. Logan further contends that counsel "failed to ensure the recorded telephone calls between [herself] and J.C.'s father only contained evidence relevant to motive or some other proper purpose." Logan asserts that counsel's failure to seek redaction of portions of the recordings in which she could be heard yelling at her children was objectively unreasonable because they lacked "any probative value on the question of whether [she] committed the charged offense."

¶ 88        We reject this argument for substantially the same reason as the arguments concerning the fifth and fourth amendments. Assuming Logan's trial counsel's performance fell below an objective standard of reasonableness, none of the defendant's suggested piecemeal redactions had a reasonable probability of changing the outcome of the trial, because the remaining evidence of Logan's guilt was overwhelming.

¶ 89                                                    CONCLUSION

¶ 90        For the foregoing reasons, we affirm the judgment of the appellate court, albeit on different grounds than those put forward by the appellate court in affirming the judgment of the circuit court. Although we find that a *Miranda* violation occurred in this case, we hold that it did not amount to plain error because it was not a structural error and the evidence of guilt presented at trial was not closely balanced.

¶ 91        Judgments affirmed.

¶ 92        JUSTICE HOLDER WHITE took no part in the consideration or decision of this case.