2025 IL App (1st) 230604-U

SIXTH DIVISION
September 12, 2025

No. 1-23-0604

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 16 CR 12834 |
| | ) | |
| WILLIAM HILL, | ) | Honorable |
| | ) | Michael B. McHale, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE C.A. WALKER delivered the judgment of the court.
Justices Hyman and Gamrath concurred in the judgment.

**ORDER**

¶ 1    *Held:*    We reverse defendant-appellant William Hill's conviction for first degree murder and remand for a new trial because his trial counsel provided ineffective assistance by failing to sufficiently communicate with Hill and failing to investigate a witness of whom Hill informed counsel.

¶ 2 Following a jury trial, defendant William Hill was found not guilty of two counts of attempt first degree murder but guilty of first degree murder of the victim Jeremy Rogers and sentenced to 35 years' imprisonment. He appeals, claiming he is entitled to a new trial because he received ineffective assistance of counsel, as well as evidentiary error, prosecutorial misconduct, and a jury polling error. Because Hill's trial counsel provided ineffective assistance by failing to communicate sufficiently with Hill and failing to investigate a witness of whom Hill informed him, we reverse and remand for a new trial.

¶ 3 BACKGROUND

¶ 4 Hill was arrested on July 25, 2016, and charged via indictment with eight counts, including counts I and II for first degree murder (720 ILCS 5/9-1(a)(1) (West Supp. 2015)) of the victim Rogers, and additional counts for attempt first degree murder against Ronaldo Cubero and Joselyn Lopez.

¶ 5 The State moved pretrial to admit evidence of "other crimes" per Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011). In support, the State contended that Rogers' shooting arose from an incident outside of a BP gas station on the 3900 block of West Belmont Avenue in Chicago following a gang-related verbal altercation between Rogers and Hill. The State continued that two months earlier, at a Citgo gas station on the 2600 block of North Central Avenue in Chicago, Hill was allegedly involved in another gang-related altercation that led to a shooting. The State contended the Citgo incident demonstrated Hill's "criminal intent, lack of innocent frame of mind, *modus operandi* and common scheme or design with the [BP incident]." During argument on the motion, the State argued the Citgo incident had "common features" with the BP incident, specifically that they involved "rival gang disputes"; Hill instructed another to shoot an identified "target"; and Hill fled with the shooter in each. Defense counsel responded that the evidence would

unduly prejudice Hill, and was not illustrative of intent or identity. The circuit court granted the State's motion.

¶ 6    Trial testimony began on November 19, 2019. During opening statements, defense counsel's remarks included the following: "And all of a sudden [Hill] walks out of the store and a guy gets in his face. That's called provocation. And we have asserted a claim of self-defense of provocation."

¶ 7    At trial, Michael Sas testified that on June 5, 2016, he lived approximately 30 yards away from the BP in a fourth-floor apartment. Early in the morning of June 5, he heard an argument from outside his window and looked towards the BP, though he could not discern what was being said. During the argument, Sas saw "a male running through a laundromat parking lot. He ran up to the group and hesitated and then made like an immediate right ***and took out a *** pistol *** and he started shooting." The laundromat was across the street from the BP. Sas saw the person arguing with the victim use a cell phone before the shooting.

¶ 8    Joselyn Lopez testified that she met Rogers through Cubero, her co-worker. On the night of June 4, 2016, she was with Cubero at a bar. Shortly after midnight, she and Cubero picked up Rogers, and the three went to another bar called Teasers. There, Rogers interacted with a group of men Lopez had never seen before. At 4 a.m. the next morning, Lopez and Cubero left Teasers, but Rogers stayed behind. Lopez attempted to drop Cubero off (at the home he shared with Rogers), but he was asleep in the vehicle and Lopez could not wake him up. She received a call from Rogers, and as a result drove to the BP and waited for Rogers to arrive.

¶ 9    Lopez parked facing a laundromat located across the street. Minutes later, a vehicle containing Rogers and the three men from Teasers arrived. Lopez then saw Rogers began a verbal "confrontation" with Hill, who was also at the BP, and whom Lopez identified in court. She could

not hear what the two said to each other. One of the three men from Teasers told Rogers to stop, while another knocked on Lopez's window and told her to "get [Rogers] out of there."

¶ 10   At some point, Hill "appeared to be making a call phone call *** [a]nd shortly thereafter [Lopez] spotted another individual coming from the parking lot of the laundromat." Lopez could not hear the content of Hill's phone conversation. The man coming from the laundromat wore a mask. Before the masked man approached, Lopez heard Rogers say to Cubero that Hill was "trying to gang bang at" him. The masked man arrived "aggressively," pulled up his shirt, removed a firearm from his waistband, and started shooting, with "no pause in between." The shooter fired six or seven times in Lopez's direction. Lopez ducked, and when the shooting stopped, she looked up and saw the shooter and Hill "running off" together towards the laundromat.

¶ 11   Lopez exited and saw Rogers on the ground behind her vehicle. She checked his pulse then called 911. The paramedics arrived shortly thereafter, and Lopez also spoke to detectives on the scene. She later identified Hill in a photo array at the police station.

¶ 12   On cross-examination, Lopez testified that she could not recall exactly how much alcohol she consumed on June 4 and 5, 2016. The shooter arrived at the BP less than one minute after Hill's call. On recross-examination, she did not recall whether the shooter and Hill communicated with each other before the shooting.

¶ 13   Cubero testified that he and Rogers were close friends and roommates. On June 5, at around 4 to 4:30 a.m., he left Teasers with Lopez while Rogers stayed behind. Cubero "passed out" during the ride due to his alcohol consumption. When he woke up, he and Lopez were at the BP. Rogers arrived a short time later, approached Lopez's vehicle, and told Cubero that "that he was getting into it with some gang bangers." Cubero gave Rogers the keys to their apartment, and Rogers moved towards the front of the vehicle. While in that location, however, Rogers "got into the

confrontation with" Hill, whom Cubero identified in court. Cubero heard Hill say he was "a four from LA street and his name is Montana to ask about him." Cubero "used to gang bang," so he understood that Hill was saying he was a member of the "Four Corner Hustler" gang. Cubero saw Hill on his phone. After Cubero heard Hill's comment, he grew more alert, though "not sober."

¶ 14 Around this time, another individual ran from a laundromat across the street and approached Hill. Cubero exited the vehicle and heard Hill say to the person from the laundromat, while pointing at Rogers, "That's these [guys] right here. Get them." The shooter pulled a firearm from his waist and started shooting. Cubero ran "towards the back of the gas station" until the shots stopped, then returned to Lopez's vehicle and saw Rogers on the ground. Cubero stayed with Rogers until the ambulance arrived and spoke to Chicago police detectives on the scene. On June 12, 2016, Cubero identified Hill in a photo array at the police station.

¶ 15 Dominic Bonelli testified that he was currently "in custody" at Lake County Jail, and also had multiple convictions besides the charge on which he was currently incarcerated. He was at Teasers the morning of June 5, 2016, with his nephew Brian Vetter and "a few friends." Bonelli met Rogers at Teasers. After the bar closed, Rogers, Bonelli, Vetter, and another individual left in Vetter's vehicle. Rogers was drunk and acting belligerently. Bonelli threatened to kick Rogers out of the vehicle but ultimately agreed to take Rogers to the BP.

¶ 16 At the BP, Bonelli saw Rogers instigate an argument with Hill, whom Bonelli identified in court. Bonelli saw Rogers "gang banging" towards Hill, which Bonelli recognized because he used to be a member of the Maniac Latin Disciples gang. Hill's initial response was to smile at Rogers, but he then told Rogers to shut his mouth. Bonelli tried to defuse the situation by telling Hill that Rogers was just drunk and to "let it go." Hill shook Bonelli's hand and introduced himself, and Bonelli believed that would be the end of the situation. Rogers, however, continued to instigate

and "run up" on Hill, who responded by taking off his belt and wrapping it around his hand. Bonelli told Hill, "Don't do it."

¶ 17    Bonelli heard a phone ring, which appeared to be Hill's. Moments later, a person ran towards the BP from the laundromat across the street. This individual "just pulled a gun and started shooting." Before the shots, the individual said to Hill, "This mother f***** right here?" Hill responded to the shooter, "No that mother f***** right there." When Bonelli then heard the gunshots, he jumped into Vetter's vehicle, and the group "sped off." On June 13, 2016, Bonelli identified Hill in a photo array at the police station.

¶ 18    Vetter testified that he had a conviction for possession of a stolen firearm. He recalled Rogers initiating the argument with Hill at the BP. While Bonelli tried to calm Hill, Vetter noticed Hill appeared to be having a phone conversation. After Hill hung up the phone, Vetter "saw somebody run up. He also had his phone in his hand." Hill and the other individual spoke, but Vetter could not hear the conversation. The individual then ran past Vetter and exited the BP. Shortly thereafter, yet "another man came out of *** an alley and *** it looked like he was holding his pants up." This man wore a hood that obscured his face. He came from the direction of the laundromat. The man approached Hill and "asked which guy was it." Hill responded "that mother f***** right there" and pointed to Rogers. The hooded man "pulled out a gun and immediately started shooting." Vetter identified Hill in a photo array on June 13.

¶ 19    On cross-examination, Vetter testified he never saw Hill or Rogers with a firearm. He confirmed Bonelli was a gang member. Approximately three minutes elapsed from the time the first man with a cell phone walked past him and the shooter emerged from the laundromat.

¶ 20    Chicago police officer David Pfest testified that on June 5, 2016, he responded to a call of shots fired at the BP. He secured the crime scene, interviewed witnesses, and collected evidence.

¶ 21   Marc Pomerance, a forensic scientist for the Illinois State Police, testified that he analyzed shell casings, fired bullets, and bullet fragments in relation to Rogers' shooting, and concluded the casings and bullets were from a .40 caliber Smith & Wesson firearm, and the fragments could have been fired from that same firearm.

¶ 22   Chicago police forensic investigator Brian Smith testified that he discovered "bullet damage" to the gas pump and side of the BP along with the vehicle. On cross-examination, he confirmed he never located a firearm or phone in connection with the case.

¶ 23   The parties stipulated to the following testimony:

(1) Dr. Kristen Escobar Alvarenga would testify that she performed Rogers' autopsy and concluded the cause of death was a gunshot wound to the head, and the manner of death was homicide.

(2) Dr. Juan Sanchez Gonzalez treated Rogers at the hospital, and a toxicology screening of Rogers showed a blood alcohol level of .181 and a positive test for "cannabinoids, cocaine, and opiates."

(3) Chicago police evidence technician Mark Davis would testify to the chain of custody of bullet and DNA evidence connected with the case.

¶ 24   Chicago police detective Juan Carlos Morales testified that he suggested the investigating detectives on Rogers' case should speak to Hill based on Morales' knowledge of the Four Corner Hustlers gang.

¶ 25   Chicago police detective Jacinto Gonzalez testified that he investigated Rogers' shooting and interviewed Hill at the police station in relation to the investigation. Hill's mother accompanied him because he was a juvenile at the time. Hill provided a statement during the interview, a video of which was played for the jury.

¶ 26    In the video, contained in the record on appeal, Hill states he was at his girlfriend's house on the morning of June 5, 2016, and went to the BP to buy a pack of blunts. When he exited the store, Rogers approached and "verbally assault[ed]" him. Hill then called his "friend to let him know that I'm right here at the gas station so I'm gonna be over there in a little bit," and explain that someone was "tweaking on him." His friend did not answer the phone. Rogers asked why Hill was on Belmont and said he did not belong there, and Hill responded that he could go wherever he wanted. Hill denied gang banging to Rogers, but did take off his sweater and belt to fight Rogers because Hill intended to "stand" his "ground." Another man approached and told Hill that Rogers was just drunk and Hill should leave. Hill intended take this advice, but moments later, "somebody came and just started shooting."  The shooter randomly approached. Hill never saw the shooter and ran away from the BP alone when he heard the shots. He was not sure whether he and the shooter ran away in the same direction.

¶ 27    Chicago police detective David Healey testified that he was assigned to Rogers' shooting on the morning of June 5, 2016, and after responding to the scene, he helped retrieve video from multiple cameras in the area, including from nearby businesses and red light cameras, though the surveillance video from the BP itself was unavailable. The parties entered stipulations related to the video footage from seven cameras in the area near the BP. One set of videos, from cameras located in the laundromat, captured most of the incident. The State played these videos, contained in the record on appeal, for the jury.

¶ 28    The first video depicts the inside of the laundromat, with the street, and the front of BP, visible through the glass front doors. A white vehicle pulls into the BP. Shortly thereafter, an individual enters the BP store on foot. This person initially crossed the street to the BP from the side of the street of the laundromat. When this first crosser exits the store and walks past the white

8

vehicle, he stops, and another person exits from the vehicle and interacts with the first crosser. Beginning at 4:58 a.m., these two individuals appear to shove each other, and a third person then approaches the two. The individuals start to walk closer to the street, and the first crosser separates from the group and paces with his hand towards his ear as if using his cell phone.

¶ 29     The first crosser walks back towards the store itself, and the initial crosser and the person that first confronted him raise their fists. At 5:01:43 a.m., a second crosser enters the camera's view from the same location as the first crosser. This person runs to the BP with his right hand over his pocket. When he arrives at the BP, he stops near the first crosser, then walks through the fueling area and exits from camera view.

¶ 30     At approximately 5:02:47 a.m., a third crosser, the shooter, enters the screen from the same area as the other two crossers. This individual walks quickly across the street towards the BP, but is not running. He also appears to interact with the first crosser. At this point, the person who tried to break up the initial argument is also standing near the first crosser. The shooter walks away from these two individuals, moves closer to the fueling area, and moves his right arm as if removing something from his pocket or waistband. This appears to be the moment of the shooting. The shooter and the first crosser then run in the same direction back across the street towards the laundromat in close proximity to each other.

¶ 31     Video from another camera in the laundromat parking lot shows the shooter enter the camera from left to right, pulling a mask over his face. This same angle shows that person and another individual running together from right to left, back towards the area from which the masked person initially emerged, approximately 20 seconds later. Finally, video from a third camera angle from the laundromat parking lot shows that the shooter had his hand in his right pocket as he crossed the street, and also depicts the two men running away from the BP in close proximity.

¶ 32    Amanda Quinlan testified regarding the Citgo incident. On April 8, 2016, she was with her sisters, Destiny Mercado and Veronica Lopez, and her nephew, Angel Perez, at the Citgo at 11:30 p.m. Angel exited their vehicle to pump gas, and Quinlan entered the store to buy cigarettes. While inside, she saw Hill, who she knew from the neighborhood. Quinlan and Hill exchanged words. Quinlan confirmed she testified before a grand jury that Hill said to her, "where the queens at," a reference Quinlan understood to be derogatory towards the Milwaukee Kings gang. Hill and Perez then began arguing outside near the gas pumps. At some point, the two physically fought. Another individual was with Hill. During the fight, Perez went towards the back of his vehicle and opened the trunk. She then heard two gunshots and saw Hill and the other individual run to their vehicle and drive away. Quinlan agreed she testified to the grand jury that she told Hill to leave Perez alone because he did not "gang bang," but Hill said he wanted to "check" Perez. On cross-examination, Quinlan testified that Hill did not say anything to the shooter immediately before he opened fire.

¶ 33    The State's attorney published video of the Citgo incident, which Quinlan agreed was an accurate depiction. The video, included in the record on appeal, shows the inside of a convenience store. Quinlan stands in an aisle near the bottom of the screen. A man walks past her in a black hooded sweatshirt, whom Quinlan identified as Hill. The State also played video from the gas pump area, which showed two white vehicles. Quinlan confirmed Perez's vehicle was closest to the screen. Hill approaches Perez's vehicle and makes hand gestures, then walks to the driver's side door. Perez exits, and the two raise their fists. Other individuals emerge from both vehicles, including two women from Perez's vehicle, and Rodriguez from the vehicle further away from the camera. Quinlan also approaches from the store. Hill and Perez make hand gestures towards each other. The group breaks up for a moment, but then Perez runs towards his trunk and opens it, and

Hill follows. As Hill does so, he looks over his shoulder at Rodriguez, who follows, positions himself behind Hill and Perez, removes a firearm, and fires. Rodriguez and Hill run to their vehicle and drive away.

¶ 34   Perez testified that he had prior convictions for possession of a controlled substance, possession of a stolen motor vehicle, and burglary. During the Citgo incident, Perez had finished pumping gas and was seated in his vehicle waiting for Quinlan to return from the store when Hill "c[ame] and hit[] the hood of my car and start[ed] throwing down gang signs at me." Hill said "MK killer" to Perez, which he understood to mean Milwaukee King killer. Perez had never met Hill before. Perez exited the vehicle and Hill attacked him, initiating a physical struggle, during which Perez heard Hill tell Rodriguez "pop his a**." As Perez opened his trunk to retrieve a hammer or screwdriver to defend himself, he heard Hill repeat, "hurry up" and "pop his a**," and Rodriguez then shot him once in his left hip. Perez received treatment at the hospital for his injuries and was released the next day.

¶ 35   The State again played video of the incident, during which Perez stated the video showed Rodriguez, "asking should I pop him. And this is when [Hill] says hurry up and pop his a**." On cross-examination, Perez testified that the video depicted Hill look over his shoulder towards Rodriguez during the fight, and it was at this point that Hill said "pop his a**."

¶ 36   The State rested, and the circuit court denied Hill's motion for a directed verdict.

¶ 37   During direct examination, Defense counsel asked Hill, "what nationality are you?" Hill replied "My mother is Mexican, and my father is African American." Counsel then asked about Hill's "skin tone" in the summer, to which Hill replied, "I will say my skin will get really dark due to the sun being exposed to my skin." Defense counsel did not ask Hill any substantive questions

about either the BP or Citgo incidents. On cross-examination, Hill acknowledged he had "MKK" tattooed on his face, and a Four Corner Hustlers tattoo on his arm.

¶ 38    During the jury instruction conference, the circuit court denied Hill's request for a self-defense instruction, reasoning that the evidence did not show Hill either subjectively believed deadly force was necessary or that such a belief was objectively reasonable.

¶ 39    During closing arguments, the prosecutor stated that Hill "got on his phone and he called a hit man," contending the evidence, including the video, established that Hill called the shooter.

¶ 40    During deliberations, the jury sent a question to the court reading, "Your Honor, we still have not come to a unanimous decision on this matter. What are the next steps if we do not come to a unanimous decision?"

¶ 41    The jury found Hill not guilty of attempt first degree murder for Lopez and Cubero, but guilty of first degree murder of Rogers (counts I and II).[1]

¶ 42    Hill requested that the circuit court poll the jury. During the poll, the following exchange occurred:

"Court: [Juror name], were these then and are these your verdicts? *** [You are] [s]haking your head yes. I need an answer. Okay. Take your time [].

Juror:  Sorry.

Court: It's okay. Catch your breath. I just need a yes or no answer. It sure looks like a yes, but is it a yes? Shaking your head, yes. I know you're upset. I have to return you to the jury room if I can't get an answer.

Juror: Okay. Because I…

---

[1] The jury also found the State did not establish Hill was armed with a firearm during the commission of the offense.

Court: No, no, no []. I don't want an explanation.

Juror: Yes.

Court: Thank you."

¶ 43 Hill's trial counsel filed a motion for a new trial, but was soon replaced by posttrial counsel, who filed an "amended omnibus motion for a judgment of acquittal or a new trial." In the motion, Hill claimed in relevant part that (1) the court should not have admitted evidence of the Citgo incident, (2) an error in the jury polling, and (3) prosecutorial misconduct at closing argument. Hill also alleged ineffective assistance of his trial counsel for failing to investigate Rodriguez as a potential trial witness, failing to sufficiently communicate with Hill, advising that Hill "fake crazy," and suggesting Hill post bail and flee to Mexico.

¶ 44 Hill attached Rodriguez's affidavit and letter to the omnibus posttrial motion, in which Rodriguez stated that if called at trial, he would testify he shot Perez independent of any suggestion from Hill. Hill was "disgust[ed]" with Rodriguez after the incident. Rodriguez maintained to the police that he was the shooter and Hill was not involved. Also attached to the motion were jail visitation records for Hill dating to March 4, 2018, in which trial counsel's name does not appear.

¶ 45 The circuit court denied Hill's posttrial motion following oral argument. Before the argument, the parties stipulated to the visitation records. Trial counsel and Hill both testified. Hill testified that counsel never visited him while he was in jail pending trial. The only conversations they had occurred before proceedings at the courthouse in the lockup, with other inmates present. Regarding the Citgo incident, Hill told trial counsel before trial that he had two witnesses that would testify on his behalf, including Rodriguez, who ultimately pled guilty to Perez's shooting. Trial counsel never interviewed either witness, and never explained his reasoning behind these decisions to Hill.

¶ 46    Hill only discussed his trial testimony with trial counsel "ten minutes before" Hill took the stand. During that conversation, Hill told trial counsel he was going to testify,

"There was a person that I had made a phone call to which I knew was going to be brought up and I told him they weren't there. He never went to go speak to them and they weren't going to be able to corroborate my testimony. So he told me that he wasn't going to ask me any questions based off of that so it wouldn't be within the scope. At the time I didn't know what a scope was."

¶ 47    On cross-examination, Hill testified trial counsel also never spoke to him on the phone. Hill was aware that Rodriguez was charged with attempt first degree murder in connection with the Citgo incident. Hill only saw the video evidence in his case during the trial itself.

¶ 48    Trial counsel testified that he met with Hill "once in the jail I believe and then the rest of the time I met with him when was in the lockup in court." He also "met him in person before the case commenced." Counsel could not recall if he received calls from Hill while he was in jail. He tried unsuccessfully to contact two people about the Citgo incident at Hill's request. Counsel believed the best defense was that Hill "didn't shoot and he didn't know who the shooter was," but he decided to also argue self-defense in the alternative.

¶ 49    On cross-examination, trial counsel testified that the first time he discussed the BP incident with Hill was after he was arrested and in custody. When counsel told Hill about the plan to pursue self-defense in the alternative, Hill said, "[n]othing" in response. Respecting a potential misidentification defense, trial counsel stated that because Hill admitted to the police he was present, "we couldn't say that he was not there at all." Instead, counsel argued that "nobody could identify him—who was who in the video." Trial counsel and Hill discussed "numerous times" whether Hill would testify, and "in the end we decided there should be a very narrow testimony."

14

Counsel explained to Hill it was his decision whether to testify, but it was counsel's recommendation to keep his testimony narrow, and "ultimately [Hill] has to decide." He did not ask Hill any questions about the shooting itself because he "didn't want to open the door to a lot of State questions." On Rodriguez, trial counsel stated, "I believe one of the persons we looked into was locked up facing a murder. I'm not sure."

¶ 50    In denying the motion, on ineffective assistance, the circuit court found Hill could not establish prejudice for counsel's failure to investigate Rodriguez because, "That gentleman was not going to testify. He was looking at 6 to 30 years at 85%, and his case was still pending." The court also called the value of Rodriguez's potential testimony "virtually non-existent." The court further clarified that prejudice could not be established generally for Hill's ineffective assistance claims because the evidence in the case was not close. It continued that Hill admitted he had many conversations with trial counsel, and the fact that they occurred in the courthouse lockup with other inmates present did not devalue the conversations by potentially destroying privilege.

¶ 51    The matter moved to sentencing where, following a hearing, the circuit court merged count II into count I and sentenced Hill to 35 years' imprisonment. This appeal followed. There is no indication from the record that Hill filed a motion to reconsider sentence.

¶ 52                          JURISDICTION

¶ 53    The circuit court sentenced Hill on March 21, 2023, and he filed his notice of appeal on March 28, 2023, giving this court jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. Apr. 15, 2024).

¶ 54                          ANALYSIS

¶ 55    On appeal, Hill raises four claims: (1) ineffective assistance of counsel, (2) evidentiary error in admitting evidence of the Citgo incident; (3) prosecutorial misconduct during the State's closing argument, and (4) an error in the circuit court's jury polling.

¶ 56    We begin with ineffective assistance of counsel. Criminal defendants have a constitutional right to effective assistance of counsel at trial, as explained by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish a claim of ineffective assistance of counsel, a claimant must establish two prongs: (1) his counsel's conduct fell below an objective standard of reasonableness, and (2) prejudice from the unreasonable conduct, requiring a showing that there was a reasonable probability of a different result but for the conduct. *People v. Logan*, 2024 IL 129054, ¶ 82. If a litigant cannot establish both prongs, the claim fails. *Id.* ¶ 83. "Although the performance and prejudice components of an ineffectiveness inquiry present mixed questions of law and fact ***, our standard of review for determining whether a defendant was denied effective assistance of counsel is ultimately *de novo*." *People v. Johnson*, 2021 IL 126291, ¶ 52.

¶ 57    Hill advances four theories for trial counsel's ineffectiveness: Counsel (1) failed to effectively communicate with Hill, generally prejudicing him and also specifically denying Hill his right to testify; (2) failed to investigate Rodriguez as a witness; and pursued meritless theories of (3) self-defense and (4) misidentification at trial, despite both being counter to the evidence and contrary to the defense Hill wanted to pursue.

¶ 58    The primary theory for ineffective assistance is that trial counsel failed to effectively communicate with Hill throughout the case. Hill emphasizes the lack of prison visitation or telephone calls, and the fact that most (if not all) of Hill and trial counsel's conversations occurred in the courthouse lockup with other defendants present. Hill further maintains that this lack of communication functionally denied his constitutional right to testify, as counsel only asked him

severely limited questions while on the stand and only explained this strategy to Hill ten minutes before he testified.

¶ 59    An attorney's failure to communicate with a client can constitute ineffective assistance, including the failure to visit a client while he is in prison to review the case generally and discovery materials specifically. See *People v. Bass*, 2022 IL App (1st) 210249, ¶¶ 18-24. Defense counsel's failure to make such visits may deprive his client of the chance to meaningfully participate in his defense. *Id.* ¶ 22.

¶ 60    The testimony at the posttrial hearing supports Hill's characterization of trial counsel's lack of communication, as the prison visitation logs confirm that counsel may not have visited at all, and certainly did not do so regularly, and Hill did not review discovery (including the videos) pretrial. Additionally, counsel's testimony supported Hill's version that there was minimal telephone contact, and the majority of communication occurred in the courthouse lockup. Given the seriousness of the charges Hill faced and the fact he was a juvenile at the time of the incident, this level of communication constituted objectively unreasonable conduct. *Id.* ¶ 24 ("Given the significance of the murder charge [the defendant] faced and the nature of the evidence against him *** counsel's alleged failure to have a confidential consultation (either by phone or in person) fell below an objective standard of reasonableness."). We find the law requires criminal defense counsel to provide representation far more thorough than what was rendered here, particularly in a case involving a first degree murder charge.

¶ 61    Counsel's communication failures also appear to have impacted Hill's right to testify. A criminal defendant has a constitutional right to determine whether he will testify at trial. *People v. Knapp*, 2020 IL 124992, ¶ 46. A claim for ineffective assistance of counsel for denial of this right

17

must still establish both objectively unreasonable conduct and prejudice. See *People v. Coleman*, 2011 IL App (1st) 091005, ¶ 34.

¶ 62    The record on this issue was also developed at the posttrial motion hearing, where Hill and trial counsel offered conflicting accounts. Hill claimed counsel only explained his strategy the day Hill was set to testify, while counsel claimed the two had many conversations about whether he should testify, and counsel explained in full his recommendation for limited testimony based on the risk of cross-examination. The circuit court did not make a finding on the record of which account it found credible, resolving the claim on Hill's inability to show prejudice. Given the prison visitation logs and counsel's admission that most conversations occurred in lockup, however, we find that the record supports Hill's argument that he was not sufficiently prepared by his counsel to determine the scope of his testimony, which further demonstrates that counsel's failure to communicate was objectively unreasonable. See *Knapp*, 2020 IL 124992, ¶ 46 (The decision of whether to testify "should be made with the advice of counsel.").

¶ 63    Before analyzing prejudice, we find it instructive to first consider the objective reasonableness of trial counsel's conduct as it respects the investigation of Rodriguez. Hill asserts that Rodriguez would have testified that he decided on his own to discharge a firearm during the Citgo incident and attached Rodriguez's affidavit to this effect to his posttrial motion.

¶ 64    Counsel has a duty to investigate witnesses that his client alerts him to, and the failure to do so can constitute objectively unreasonable conduct for purposes of ineffective assistance of counsel. *People v. Coleman*, 183 Ill. 2d 366, 398 (1998); *Bass*, 2022 IL App (1st) 210249, ¶ 30.

¶ 65    The testimony at the posttrial hearing suggests Hill informed trial counsel of Rodriguez's potential availability, but counsel did not interview Rodriguez and did not make a meaningful attempt to contact him. In denying this claim, the circuit court found trial counsel's conduct was

not objectively unreasonable because it presumed Rodriguez would not have testified, given that he was facing an attempt first degree murder charge in the Perez shooting.

¶ 66    We find the circuit court erred by resolving this issue simply by presuming that Rodriguez would not have testified, and that trial counsel's decision to functionally ignore Rodriguez as a potential witness was objectively unreasonable. Though his testimony may have been self-incriminating, Rodriguez might still have testified, and the fact that it was potentially unlikely did not excuse counsel from his duty to investigate. See *People v. Makiel*, 358 Ill. App. 3d 102, 107-08 (2005) ("Attorneys have an obligation to explore all readily available sources of evidence," and failing "to present available witnesses to corroborate a defense has been found to be ineffective assistance."). Indeed, the record suggests Rodriguez could very well have been willing to testify, as he pled guilty in the Perez shooting and signed an affidavit for Hill asserting this willingness.

¶ 67    Trial counsel apparently made little to no effort to contact Rodriguez, testifying only that he could not recall if he tried to contact someone that was already imprisoned. There is no dispute that Rodriguez was imprisoned, meaning counsel at the very least should have been able to contact him to determine if he was willing to testify. An attorney making a reasonable effort would have made this contact to assess Rodriguez's willingness to testify or had some explanation as to why he could not contact the witness despite knowing his whereabouts.[2]

¶ 68    Having found that trial counsel's conduct was objectively unreasonable in multiple respects, we now move to the second prong of ineffective assistance of counsel and conclude that the cumulative impact of trial counsel's unreasonable conduct supports a finding that had counsel

---

[2] The State cites *People v. Molstad*, 101 Ill. 2d 128, 135 (1984), for the proposition that no due diligence could have forced Rodriguez to testify. This passage of *Molstad*, however, dealt with the due diligence element of a motion for a new trial, not ineffective assistance of counsel, and as such the *Molstad* court provides no guidance on analyzing objective reasonableness in this context.

not committed these errors, there was a reasonable probability of a different result at trial. See *People v. Moore,* 356 Ill. App. 3d 117, 130 (2005) ("The totality of defense counsel's deficient performance demonstrated ineffective assistance which prejudiced defendant requiring a new trial."); *People v. Vera,* 277 Ill. App. 3d 130, 141 (1995) (finding of prejudice where though counsel's errors in isolation may not have sufficed, the cumulative effect undermined the reliability of the result); see also *People v. Tillman*, 226 Ill. App. 3d 1, 18 (1991); *People v. Bell*, Ill. App. 3d 1007, 1011 (1987).

¶ 69    The "reasonable probability" determination requires a reviewing court to find that counsel's objectively unreasonable conduct so affected the trial that the court lacks confidence in the result. *Logan*, 2024 IL 129054, ¶ 82. This is such a case. The failure to communicate, in particular, was so pervasive that a trial conducted with proper communication would almost certainly have been unrecognizable from that which unfolded. How would a hypothetical trial have played out had Hill and his counsel arrived at an agreed strategy, with Hill testifying substantively in his defense after having a full understanding of the evidence against him, and Rodriguez testifying that Hill was not involved in the Citgo shooting? We cannot know, but we can be sure this trial would bear little resemblance to the one that occurred and would at least have been conducted with an informed and prepared client and coherent defense strategy. Moreover, the record indicates the jury may have believed the evidence was close, as it asked the circuit court what would happen in the event they could not come to a unanimous agreement. See *People v. Jackson*, 2016 IL App (1st) 133741, ¶ 62 (discussing *People v. Gray*, 406 Ill. App. 3d 466, 474 (2010)) (length of jury deliberations can be a factor for reviewing court to consider in determining closeness of the evidence at trial). Given the scope of trial counsel's unreasonable conduct and how it permeated the entirety of Hill's defense, our confidence in the result at trial is sufficiently

undermined to require reversal. See *Moore*, 356 Ill App. 3d at 130 (court could not conclude trial was "fundamentally fair" given pervasiveness of counsel's errors).

¶ 70    Trial counsel's decision to pursue self-defense and misidentification theories lends further support to this conclusion. Counsel should have known the self-defense and misidentification theories he pursued were nonviable because each was counter to the anticipated evidence at trial, and very well could have known his client did not want to pursue the defenses if counsel had simply communicated with him. There was no dispute Hill was on scene, and no evidence he subjectively believed he needed to act with deadly force. So while Hill's standalone claims for ineffective assistance on these issues were likely doomed to fail because these are matters of trial strategy (see *People v. West,* 187 Ill. 2d 418, 432 (1999)), it is instructive to consider counsel's decisions to pursue these unsupported defenses as further evidence of the impact poor communication had on the trial.

¶ 71    Finally, we note that because we remand for a new trial based on ineffective assistance, we need not and do not reach the substance of the Hill's other claims regarding  admissibility of the Citgo incident evidence, prosecutorial misconduct, and jury polling error.

¶ 72    The State first argues that Hill cannot pursue any issue regarding his right to testify because the omnibus posttrial motion did not specifically mention this issue, and thus Hill waived it as a theory for ineffective assistance. See *People v. Staake*, 2017 IL 121755, ¶ 30. The record shows this contention is meritless. Hill included complaints about counsel's failure to communicate in the written motion, and then specifically testified about not being prepared regarding his own testimony at the posttrial hearing.

¶ 73    Next, the State contends that counsel's communication with Hill was in fact sufficient because the record establishes they had multiple conversations in the lockup. We disagree. This

was a first degree murder trial, requiring unique and extensive preparation in any circumstance, let alone with a defendant charged while still a minor and a trial record that consists of multiple videos depicting the defendant's conduct and numerous witnesses with whom the defendant admitted to interacting. Contrary to the State's assertion, the nature of the meetings as testified to by counsel himself only demonstrates that the meetings in lockup were insufficient, and thus grounds for a finding of objective unreasonableness; at the very least, an in-person discussion regarding the evidence which included review of the actual videos themselves was necessary before Hill faced such serious charges. See *Bass*, 2022 IL App (1st) 210249, ¶¶ 18-24. This also defeats the State's argument that we should resolve the case in its favor because the lower court apparently accepted trial counsel's testimony over Hill's regarding the nature of their lockup meetings.

¶ 74 The State further contends Hill was not prejudiced by the fact he did not testify substantively because his proffered testimony would have been cumulative. See *People v. Hayes*, 2011 IL App (1st) 100127, ¶ 42. This argument does have support in the record, as Hill's contention at the posttrial hearing was that he wanted to testify consistently with his video statement to the police, which was already in evidence. We reject, however, that Hill's posttrial hearing testimony on this point renders his potential trial testimony so obviously cumulative that he cannot support his ineffective assistance claim with this element of counsel's failure to communicate. As explained above, we cannot know the full scope and nature of the testimony Hill would have offered had he been properly prepared through in-person visits and review of the discovery materials. His testimony may very well have been cumulative or even damaging, but it may also have helped his case. While this court cannot say for certain that this one issue alone had a reasonable probability to change the result, when considered alongside the other errors delineated

22

above, the combined prejudicial effect renders the proceeding suspect as a whole. *Moore*, 356 Ill. App. 3d at 130.

¶ 75　Finally, the State argues that *Bass* should not apply because that case concerned whether the defendant's postconviction petition could survive second-stage review, meaning the defendant only had to make a substantial showing of a constitutional violation, unlike the factual and legal burden at the posttrial motion for Hill. See *People v. Agee*, 2023 IL 128413, ¶ 37. This argument fails because the circuit court did not deny Hill's claim because he could not factually establish the conduct he alleged in his motion; instead, the facts of the communications between Hill and his trial counsel were functionally undisputed, and the court's decision rested on its determination that those facts did not legally satisfy the requirements of *Strickland*. As explained above, we find that the court erred in this determination, and Hill's citation to *Bass's* discussion of how courts might apply the ineffective assistance standard in this context was appropriate for this court to consider in so deciding. *Bass*, 2022 IL App (1st) 210249, ¶¶ 18-24.

¶ 76　　　　　　　　　　　　CONCLUSION

¶ 77　Hill's trial counsel acted objectively unreasonably by failing to communicate with Hill and not sufficiently investigating whether Rodriguez would testify, and the cumulative effect of these errors rendered the trial result unreliable. Accordingly, we reverse Hill's conviction and remand for a new trial

¶ 78　Reversed and remanded for new trial.